Comfort *v.* McTeer.

JAMES COMFORT, Trustee, *v.* JOS. T. McTEER *et al.*

1. CORPORATION. *Insolvency.* *Assets.* The assets of a corporation are not turned into a trust fund for the benefit of creditors by the mere knowledge by its officers of its insolvency, but only by some positive act of insolvency, such as the making of a general assignment, the filing of a bill to administer its assets, or the permanent cessation of business; and it is only what remains due from a customer, after the settlement of mutual debts, which would constitute the trust fund.

2. SAME. *Same.* Where, therefore, after knowledge of its insolvency, but two days before it ceased to transact business, the officers of a bank entered a credit on the account of one of its customers, which was justified by the dealings between the parties, it was held that the assignee of the bank, under a general assignment for the benefit of creditors subsequently made, was bound by the transaction.

3. CHANCERY PLEADINGS AND PRACTICE. *Parties.* As a general rule, no such practice is known in equity as the making a person a defendant upon his own application, over the objection of the complainant.

4. SAME. *Cross-bill.* A cross-bill is a mode of defense or an auxiliary suit, and constitutes one cause with the original bill, and a cross-bill will not, therefore, lie, where there is no connection between the demands or the parties.

FROM KNOX.

Appeal from the Chancery Court at Knoxville. W. B. STALEY, Ch.

JAMES COMFORT for complainant.

T. S. WEBB, H. H. TAYLOR and CALDWELL & SON for defendants.

COOPER, J., delivered the opinion of the court.

On the 4th of April, 1877, the Commercial Bank,. a corporation doing business at Knoxville, made a general assignment of all its assets of every description to a trustee for the equal benefit of all its creditors. The complainant, James Comfort, was afterwards appointed trustee in place of the person named in the deed, and, on September 11, 1877, filed this bill against R. R. Bearden, M. G. Bearden, W. M. Bearden and Jos. T. McTeer, as partners under the name and style of Breedens & McTeer, to recover from them an alleged indebtedness to the bank by overdraft at the date of the assignment. Pending the litigation, Samuel McKinney was permitted by the chancellor, over the objection of the complainant, to come in and file an answer and cross-bill as a defendant. On final hearing, both the bill and cross-bill were dismissed, and complainant Comfort appealed from so much of the decree as dismissed his bill, and denied him relief.

The bill states that on the 4th of April, 1877, when the Commercial Bank suspended, its books showed a balance of $2,722.67 in favor of Beardens & McTeer. And the charge is that this balance was produced by an entry on the books of the bank, on April 2, 1877, to the credit of the firm of $10,000, without any consideration then passing, and to which the firm was not.

·entitled. The bill further alleges that the credit was ·entered by the procurement of R. R. Bearden, who was the vice-president of the bank as well as a member of Beardens & McTeer, for the purpose of procuring with the firm, for his individual benefit, a corresponding credit as for that amount of capital stock paid into the firm by him; that this was done in view of the assignment of its assets by the bank, and when its officers knew that it was insolvent; that said R. R. Bearden did, on April 20, 1877, receive from the firm the benefit of the credit in a sale of the interest of himself and his son M. G. Bearden in the partnership effects and business to their co partner, the ·defendant, Jos. T. McTeer; that this was done by McTeer assuming to pay ·an alleged indebtedness of R. R. Bearden to one Samuel McKinney, subject to ·abatement to the extent that McTeer might be deprived, by legal proceedings, of any part of the interest he had purchased from the Beardens. A copy of the contract of sale between the Beardens and McTeer, and a copy of an agreement of the same date between McTeer and McKinney, by which McTeer assumed to pay an alleged indebtedness of R. R. Bearden to McKinney, subject to abatement as aforesaid, were made ·exhibits to the bill.

McTeer, in his answer, admits that the firm of Beardens & McTeer, from its formation in 1875, continued to make its deposits and transact its business with the Commercial Bank, the balances being in favor of the firm generally until October or November, 1876, and then turning in favor of the bank. He says that

it is true, as shown by an exhibit of the bank ac-
count of the firm appended to the bill, that on April
2, 1877, Beardens & McTeer were credited with $15,-
235, composed of three items: first, of $235 deposited
on that day in the usual course of business; secondly,
of $5,000, the amount of their note made for the ac-
commodation of the bank, and which he afterwards
settled; thirdly, the sum of $10,000, placed to the
credit of the firm by direction of R. R. Bearden, being
bonds, or proceeds of bonds placed in said bank by
Samuel McKinney. It is this last item that is in
contest in the present case. "At the time the credit
was entered," says McTeer in his answer, "respondent
did not know that the credit of $10,000 was for bonds,
or the proceeds of bonds furnished by McKinney, and
intended as a loan to Bearden & McTeer, but he has
been since informed, and now believes that this credit
is based upon bonds placed in the Commercial Bank
by McKinney, with instructions to sell them, and pass
the proceeds to the credit of respondent's firm."

Further answering, McTeer says he was induced to
enter into the business of Beardens & McTeer by the
agreement of R. R. Bearden to put into the business
a certain amount of capital, and his further assurance
that he could and would, from time to time as needed,
advance such additional sums as might be necessary
for its successful prosecution; that about January, 1876,
needing money in the business, and R. R. Bearden
not being able at the time to furnish it, he applied
to Samuel McKinney for a loan of money. In his
deposition, taken by the complainant, he explains that

McKinney said he had no money to loan, but he had some Knox county bonds, which the firm could have at ninety-five cents. McTeer adds: " I told Bearden I had spoken to McKinney about borrowing money, and that McKinney said he had no money but had some bonds. I think Bearden told me that he got those bonds." He is then asked: " Did he, Bearden, tell you he got them for the benefit of your firm, or in the name of your·firm?" His answer is: " I cannot say positively; I do not think he said anything, only that he got. the bonds from McKinney. My recollection is that Bearden said he left the bonds in New York for sale, but I do not think he said a word about how he got them. I mean for whom, or on whose credit he got them. I think it was in February or March, 1876, was the first information I had about his getting the bonds." In another place McTeer says: " In consequence of having spoken to McKinney about borrowing money, and having told Bearden that McKinney· had offered to let me have some Knox county bonds, and learning afterwards that Bearden had got bonds from McKinney, I entertained some doubt as to how the bonds were held, and I· enquired of McClung (the president of the Commercial Bank) how they were held, on more than one occasion, and his reply was that he could take care of the bonds. · Mr. McClung allowed the firm to overdraw."

In his answer McTeer further ·says: " He did not then, and does not now regard the debt to McKinney as a debt ·due from the firm, but when he learned that Bearden procured the means of settling that amount

Comfort *v.* McTeer.

for the firm in bank from McKinney, he was willing to pay McKinney that amount for Bearden towards his interest in the firm, and he is still willing in good faith to carry out his part of the agreement shown in the exhibit to the bill." In his deposition McTeer says: "Bearden agreed in February, 1877, to put in more money, as I had asked him from time to time to do, by settling our account at the bank. He agreed to settle our account, and on April 2d told me to credit him with $10,000; that he had arranged our account, and to charge the bank with the amount of his credit."

The only other witness examined by the original complainant is the cashier of the Commercial Bank. He says that on the 4th of February, 1876, the Knox county bonds were used as collateral security for four notes, amounting to $10,000, executed by Beardens & McTeer, and re-discounted by the National Park Bank of New York, for the benefit of the Commercial Bank. The bank again used the bonds, June 27, 1876, with the National Park Bank, as collateral for two notes of H. L. McClung for $5,000 each. In January, 1877, the bonds were delivered by Bearden to a New York house, as collateral to his notes, on which $10,000 were received by the Park Bank, and carried to the credit of the Commercial Bank. On April 2, 1877, the witness, by the direction of the president of of the bank, made an entry on the bank books as follows: "Borrowed by R. R. Bearden on Knox county bonds $10,000." And on the same day, under like direction, he entered the credit in the account of

Beardens & McTeer. "The bank," he says, "had re-
ceived the equivalent of cash previous to April 2, 1877."
"The books of the Commercial Bank," he adds, "do
not show that the $10,000 Knox county bonds, or the
proceeds thereof, furnished by McKinney, were charged
or credited to any one until the entry of 2d April.
The bank used the bonds as collateral, and as the call
loan account was intended by the bank officers to
represent these bonds, I suppose they considered any
other entry unnecessary until they could get in posi-
tion to pay off the debt." Upon retaking his depo-
sition, the witness is of opinion that the call loan did
not represent the Knox county bonds, but the testi-
mony is not otherwise altered.

The gravamen of the bill is that the credit of
$10,000 of 2d of April, 1877, was without considera-
tion, and procured by Bearden for his individual benefit.
The answer is that the credit was based upon the
bonds placed in the bank by McKinney, with instruc-
tions to sell them and pass the proceeds to the credit
of the firm, and that Bearden procured the means of
settling that amount for the firm from McKinney.
The proof is that McTeer had first applied to Mc-
Kinney for a loan for the firm, was told that he could
have the Knox county bonds at a given price, notified
Bearden, who had contracted to furnish the capital to
run the firm business, and was told by him that he
had obtained the bonds and left them for sale in New
York. The proof further is that the Commercial Bank
had the benefit of these bonds, and allowed Beardens
& McTeer to overcheck their account; that no entry

Comfort *v.* McTeer.

on the books of the bank was made of these credits until the 2d of April, 1877, when, by direction of the president of the bank, the amount received by the bank was credited to the firm.     It is very clear that the bank, through its officers, recognized the fact that the bonds were procured by Bearden for the firm of Beardens & McTeer, and that the firm was entitled to a credit for the proceeds of the bonds actually received by the bank, through their final deposit by Bearden as collateral for his paper.     It is easy to see, too, that while the loan of the bonds was almost certainly to the firm, Bearden and McTeer might, as between themselves, consider the amount received as advanced by Bearden.     And even if the loan had been to Bearden individually, he might lawfully allow the firm to have the benefit of them, and pass the proceeds to the credit of his firm.     McTeer tells us that Bearden agreed to settle the firm account with the bank, and this he did to the extent of the $10,000 credit.     If no credit had been entered on the books, but the effect of what had occurred had been to make the bank a debtor to the firm for the bonds or their proceeds, the law would set off the one debt against the other.     It is only what remains after a settlement of the mutual debts, if any, which would constitute a trust fund for creditors: *Comfort* v. *Patterson*, 2 Lea, 602.

The theory of the bill is that the assets of the bank as they existed when the insolvency of the bank became known to its officers, became at once a trust fund for the creditors of the bank.     But the law is

clearly otherwise. There must be some positive act of insolvency, such as the filing of a bill to administer the assets, or the making a general assignment, or a permanent cessation to do business, to work the result suggested. If the corporation continue to transact business in the honest belief, or even hope of working through its difficulties, the rights of innocent third parties will not be prejudiced: *Moseby* v. *Williamson*, 5 Heis., 278. If it were otherwise, nobody would be safe in dealing with a failing corporation. Undoubtedly, the regular and fair transactions of the Commercial Bank during the two days preceding its execution of a general assignment were valid. Any honest adjustment of its accounts with its customers, based on the actual state of their mutual transactions, would be good. On the other hand, any arrangement, made with knowledge by both parties of the insolvency, and with intent to give an undue preference, would probably be vitiated by the fraud.

Shortly after the filing of the bill in this case, Samuel McKinney presented his petition asking to be made a defendant, and to be permitted to file a cross-bill. The reason of his application was stated to be that he had an interest in upholding the credit of the 2d of April, 1877. But it is obvious that the complainant could have no object in making him a defendant, for he neither sought, nor could by possibility have any relief against him. And whatever interest McKinney had in upholding the credit grew out of the peculiar agreement he made with McTeer on the 20th of April, 1877, and not out of his previous deal-

Comfort *v.* McTeer.

ings with Bearden and McTeer or with the bank. His subsequent contract with McTeer, made after the general assignment of the bank, under which the complainant claimed, would not give him any right to intervene in the litigation. He had no equities except such as he could work out through McTeer. His so-called cross-bill, moreover, had no connection with the original suit, and was based upon a virtual abandonment of his contract with McTeer, for it sought to hold the trustee liable by treating the bank as his (McKinney's) debtor for the Knox county bonds, or their proceeds. His Honor, the chancellor, clearly erred in allowing McKinney to intervene.

When a third person claims under, or in privity with one of the parties litigant, the proper mode of bringing his interest before the court is by a supplemental bill, or by an original bill in the nature of a supplemental bill: Sto. Eq. Pl., sec. 156. It cannot ordinarily be done by petition: *Foster* v. *Deacon*, 6 Madd., 59; *Carow* v. *Mowatt*, 2 Edw., 9. Where there is no privity, a person interested in the subject-matter or objects of the suit should bring forward his claim by an original bill in the nature of a supplemental bill, or in the nature of a cross-bill, as the case may be. To allow a party to come in as a defendant, claiming in a right not noticed by the bill, would be inconsistent with the rules of chancery pleading, for it would be to try rights without any issue joined. As a general rule, therefore, no such practice is known in equity as the making of a person a defendant to a pending suit on his own application, over

the objection of the complainant: *Coleman* v. *Martin,*
6 Blatchf., 119; *Drake* v. *Goodridge,* 6 Blatchf., 151;
*Shields* v. *Barrow,* 17 How., 145; *Stretch* v. *Stretch,*
2 Tenn. Ch., 140.

A cross-bill is a mode of defense or an auxiliary
suit, and constitutes one cause with the original bill:
*Cross* v. *DeValle,* 1 Wall., 1; 2 Dan. Ch. Pr., 1647.
The original bill in this case seeks a recovery against
Beardens & McTeer for overdrafts. The cross-bill of
McKinney asks a decree against the complainant for
the conversion of bonds. There is no connection be-
tween the demands or the parties. It is, in substance,
an original and not a cross-bill: *Hergel* v. *Laitenberger,*
2 Tenn. Ch., 251.

The chancellor's decree will be affirmed, the com-
plainant being charged with the costs of this court.
The costs of the court below will be paid as ordered
by the chancellor.